UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DAVID RIVERS,<br><br>   Plaintiff,<br><br>  v.<br><br>ANDREW SAUL,<br><br>   Defendant. | Case No. 20-cv-09485-WHO<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 14, 15, 18 |

  Plaintiff Ronald David Rivers, proceeding pro se, seeks review of the March 2019 determination by Administrative Law Judge ("ALJ") Cheryl Tompkin that he is not disabled and not entitled to benefits. Tompkin's 2019 decision followed a 2017 decision by Magistrate Judge Maria Elena James, Case No. 16-cv-2399-MEJ, remanding Rivers's case for further administrative proceedings in light of significant, multiple errors in the first ALJ decision (from August 2012) denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Social Security Act. Administrative Record ("AR") 91.

  On this appeal, Rivers argues that ALJ Tompkin gave too much weight to psychological expert Dr. Calvin Vanderplate – who testified at Rivers's initial ALJ hearing in 2014 – and Tompkin instead should have relied on the "much more accurate" testimony provided by one-time examining psychologist Dr. Laura Jean Catlin in August 2013. Rivers contends that Vanderplate ignored evidence regarding plaintiff's mental health conditions after his release from prison, when Rivers explains that he was suffering from the stress and trauma of having been wrongly convicted and incarcerated, and that Vanderplate assessed only Rivers's condition based on prison medical records. Dr. Catlin's opinions, according to Rivers, were more accurate because she considered Rivers's mental health after his release from prison when he was dealing with that trauma. *See* Pl.

MSJ [Dkt. No. 14] at 7-9, Pl. Reply [Dkt. No. 16] at 2-3.

Having reviewed the long record in this case as a whole, I find that sufficient, substantial evidence supports ALJ Tompkin's decision denying Rivers's claim for benefits. Defendant's motion is GRANTED, and plaintiff's motion is DENIED.[1]

## BACKGROUND

### I. PROCEDURAL HISTORY

#### A. First ALJ Hearing and Decision

ALJ Michael Blume held a hearing on September 30, 2014. AR 12. During the hearing, a psychological expert, Dr. Calvin Vanderplate testified, after reviewing the underlying medical records of Rivers, that "his depression appears to have been relatively mild" and that "[he appears capable of] completing complex tasks with mild limitations . . . moderate limitations in social functioning . . . mild to possibly low to moderate limitations in terms of pace, concentration, and persistence." AR 50, 52. Vanderplate also assessed the psychological evaluation conducted by Laura Catlin, PsyD on August 25, 2013. AR 50-52. Vanderplate opined that Rivers's self-reported description of being extremely depressed and anxious in that evaluation report was inconsistent with the rest of the record. AR 51. Vanderplate further testified that Catlin's assessment appeared to be based on checklist testing where Rivers rated himself in terms of the severity of each symptom, which would tend to involve overstatement. AR 52.

On February 20, 2015, ALJ Blume denied Rivers's claim for benefits. AR 12-21. At Step One, the ALJ found that Rivers had not engaged in substantial gainful activity since July 11, 2006. AR 14. At Step Two, the ALJ concluded that Rivers had the following severe impairments: "mood disorder not otherwise specified (NOS), anxiety disorder NOS, and personality disorder NOS." AR 14. Those impairments, however, did not meet or equal a listed impairment. AR 15.

---

[1] In the Commissioner's original motion for summary judgment, counsel inadvertently addressed only the prior decision from ALJ Blume and ignored the more recent decision from ALJ Tompkin. Therefore, I issued an Order to Show Cause to require defendant to address the correct ALJ decision. Dkt. No. 17. Rivers objects to the government being given the opportunity to address the correct ALJ decision. Dkt.No. 20. I note that objection, but because I want to make sure I consider all relevant legal arguments and evidence, I will consider the defendant's supplemental Cross-Motion for Summary Judgment. Dkt. No. 18.

2

Considering the evidence in the record, the ALJ concluded that Rivers had a Residual Function Capacity ("RFC") to perform "complex tasks" and "is limited to frequent but not constant contact with coworkers and supervisors, with no public contact." AR 16. In making this conclusion, ALJ Blume gave great weight to Dr. Vanderplate's testimony, whom the ALJ categorized as the medical expert "who had the opportunity to review the largest portion of the written record and to hear [Rivers's] testimony at the hearing." AR 18.

Specifically, ALJ Blume concluded that Vanderplate's testimony was consistent with the underlying medical records: Rivers was observed to be alert, polite, calm, well-groomed, having well-organized speech and no evidence of any severe mental disorder as of October 2012. AR 18, 682, 684. The ALJ concurred with Vanderplate's assessment of Catlin's evaluation report and gave Catlin's evaluation report no weight. AR 18-19. The ALJ agreed with Vanderplate's determination that Catlin's evaluation report appeared to have been largely based on Rivers's self-reported descriptions and was inconsistent with the underlying medical records. AR 19. Moreover, Rivers's description of the severity of his symptoms was inconsistent with Catlin's mental status examination, which mentioned Rivers's good eye contact, logical thought process, and otherwise normal interactions. AR 18-19. ALJ Blume also mentioned the medical records submitted post-hearing "regularly indicate that the claimant has remained an active, attentive, and engaged participant in group therapy." AR 18, 838. Considering the vocational expert Freeman Leeth's testimony at the hearing, the ALJ concluded that Rivers would be capable of performing past relevant work as a systems analyst, or a cleaner or machine feeder assuming a more restrictive RFC assessment. AR 19-20.

The Appeals Council declined review on ALJ Blume's denial. April 18, 2016. AR 956-62.

### B. First Review by District Court

Rivers filed an action in the Northern District of California seeking review of that denial. Case No. 16-cv-02399-MEJ. On June 28, 2017, Magistrate Judge James issued an order on the parties' motions for summary judgment. Rivers v. Berryhill, Case No. No. 16-cv-02399-MEJ, Dkt. No. 27 (June 28, 2017 Order). The central issue Judge James discussed was whether ALJ

Blume's decision to reject Catlin's evaluation report and place heavy weight on Vanderplate's testimony was supported by substantial evidence. *Id.* at 14-16. Judge James answered in the negative. *Id.*

First, Judge James concluded that the major premises of Vanderplate's opinion, which the ALJ replied on, were not based on substantial evidence. *Id.* at 15. For example, Vanderplate should have given credit to Rivers's suicide attempt in 1985 and the two multi-day suicide watches in prison. *Id.* Also, Vanderplate's statement that Rivers only experienced one isolated incident regarding "evil spirits" was inaccurate because there seemed to be multiple diagnoses of delusional disorder over several years that evil spirits have been interfering with his life. *Id.*

Second, Judge James explained that the reasons Vanderplate articulated to reject Catlin's evaluation was not justified. *Id.* 15-16. With regard to Vanderplate's concern about the mental status examination by Catlin, Judge James was concerned that Vanderplate did not explain why someone with the alleged disability would not maintain good eye contact or otherwise have a normal interaction with a single, non-confrontational examiner. *Id.* at 16. In light of Vanderplate's skepticism towards what he categorized as self-reporting descriptions (which he believed would tend to encourage exaggeration), Judge James emphasized that Catlin did not doubt Rivers's credibility and based her opinion on the interview she conducted. *Id.*

Judge James then discussed the other insufficiencies of the ALJ's decision. *Id.* at 16-17. Specifically, the ALJ did not explain how Rivers's ability to attend a total of six hours of class a week at the community college, some of which were online, would translate into an ability to hold a regular job. *Id.* Judge James also determined that the ALJ may have cherry-picked the records regarding the delusional disorder claim. *Id.*

Based on those errors, Judge James granted Rivers's Motion, reversed ALJ Blume's decision, and remanded the case for further administrative proceedings. *Id.* at 19.

### C. Proceedings on Remand

On September 6, 2018, ALJ Cheryl Tompkin held a hearing where Rivers appeared without representation. *See generally* AR 900-37. A vocational expert ("VE") Sandra Trost testified during the hearing. AR 926.

During the hearing, Rivers testified that since his first hearing he had transferred from community college to UC Berkeley. AR 908-09. He testified that his conviction and incarceration had caused him severe anxiety and depression. AR 911. With medication, Rivers said that he could function for two and a half hours, but he could only take medications once a day. *Id*. 911, 914. Beyond the two and a half hours, he would have a panic attack if getting close to someone he does not know: the symptoms included "tightness or rigidity," "tunnel vision," seeing everything in black, heart rate speeding up, and not being able to breathe. *Id.* 911 He then would try to exit the situation, and it would take five to ten minutes before he could return to normal. *Id.*

ALJ Tompkin inquired about how Rivers managed to attend classes at UC Berkeley with his symptoms. Rivers said that he would take medication every day before going to school. AR 913-14. Rivers went to school five days a week. AR 916. The ALJ then asked if Rivers were to work with the same people, whether that would trigger his anxiety or a panic attack; he responded that at a job site, "things are always different and so that's enough to trigger it." AR 914-15. Rivers also testified that anything out of the ordinary would trigger him and suggested he only wanted rare and limited interactions with the public. AR 918-19. Responding to ALJ Tompkin's inquiry about how he did his chores, Rivers said that he did laundry at around five in the morning so that no one else would be there; he went shopping when the store just opened; he usually woke up at six or seven and then went to a gym to shower; he then drove to a bus station and took the bus for 30 minutes to school, took classes for up to two hours, and got back on bus. AR 915, 923-25. Later he would get back to his car, eat, do his homework, have some entertainment on YouTube, and sleep. AR 925. Rivers prepared his own food on a regular basis. *Id.*

The VE identified Rivers's past relevant work as a System Analyst, a sedentary, skilled job (DOT #030.167-014). AR 927-28. The ALJ asked the VE to consider a hypothetical individual of Rivers's age, education and work experience, who was able to perform work at all exertion levels. AR 928. The ALJ specified that the hypothetical individual was capable of performing complex tasks and is able to tolerate frequent, but not constant, contact with supervisors and coworkers, but could not tolerate contact with the public. *Id*. Based on that hypothetical, the VE testified that

5

1    under the DOT the individual could perform his past work as generally performed in the national

2    economy. *Id.*

3          The ALJ asked the VE to consider a second hypothetical, assuming the same facts as in the

4    first hypothetical, except the individual was able to understand, remember and carry out simple

5    and semi-complex tasks, involving simple and semi-complex work related decisions, and was able

6    to adapt to routine workplace changes, and was able to tolerate occasional to frequent contact with

7    supervisors and coworkers. AR 929. Based on the second hypothetical, the VE testified that there

8    would not be any past relevant work, but the individual could work as a data entry clerk. AR 929-

9    30. Other jobs in the national economy for the individual in this hypothetical existed, including

10   hospital cleaner, ground keeper, and janitor. AR 930.

11         Finally, the ALJ asked the VE to consider a third hypothetical, assuming the same facts as

12   in the second hypothetical, except the individual would need to work in a low stress work

13   environment, defined as requiring only occasional decision making, occasional use of judgment,

14   occasional changes in the work setting and no production rate or fast paced work. AR 930. Based

15   on this hypothetical, the VE testified that the individual could do all the jobs he previously

16   indicated under the second hypothetical except data entry. AR 931. The ALJ also asked the VE

17   about the tolerance level for missing work in these job settings and the VE testified that missing

18   one day a month would be preclusive for unskilled jobs. AR 931.

19         In the end, the VE opined that Rivers could not perform his prior job, that dealt with

20   customers on a regular basis. AR 933. Regarding Rivers's concern for the other jobs the VE gave

21   under the second and third hypothetical, the VE responded that those jobs only involve indirect

22   and limited interactions with people. AR 934-35.

23         **D.**    **Second ALJ Decision**

24         In a decision dated March 18, 2019, ALJ Tompkin denied Rivers's application for DIB and

25   SSI. AR 879-891.[2] At Step One, the ALJ determined that Rivers had engaged in substantial

26   gainful activity from April 2013 to June 2013, during which Rivers did not report any physical or

---

[2] As Rivers remained insured through June 30, 2011, Rivers had to establish disability on or before that date to be eligible for DIB. AR 880.

6

mental difficulties, but that Rivers had subsequent 12-month periods during which he did not engage in substantial gainful activity. AR 882. At Step Two, the ALJ determined that Rivers had the following severe impairments: depression, anxiety, mood disorder, and personality disorder. AR 883. Those impairments, however, did not meet or equal a listed impairment. AR 882-884.

The ALJ then determined that Rivers had the RFC to perform a full range of work at all exertional levels. Mentally, Rivers "is able to understand, remember and carry out simple and semi-complex tasks, involving simple and semi-complex work-related decisions, and is able to adapt to routine workplace changes. He can tolerate frequent, but not constant, contact with supervisors and coworkers but cannot tolerate contact with the public." AR 884.

Reviewing the opinion evidence in the record, the ALJ gave partial weight to Dr. Catlin's assessment but concluded that Catlin's opinions about Rivers's limitations were overly restrictive in light of Rivers's accomplishments and activities since his release from prison. AR 888. Specifically, the ALJ noted that: Rivers represented himself over a course of years in his criminal proceedings with significant success; he maintained excellent grades in college (and was a junior at UC Berkeley and set to graduate in 2020) and was able to consistently attend classes five days a week; he engaged in substantial gainful activity during April 2013 through June 2013; and he was able to live independently while going to the gym daily, taking public transportation, and performing household chores; all of these activities are inconsistent with Catlin's opinion. *Id*. The ALJ pointed to other providers' opinions as support that Catlin's opinion was overly restrictive. For example, a Parole Outpatient Clinic ("POC") social worker noted that Rivers "doesn't seem willing to work and he would rather pretend to have a mental illness to collect SSI" in January 2013 (a few months before Catlin's evaluation) and a POC psychiatrist wrote in March 2013 that it was unclear if Rivers had a disorder beyond dysthymia/chronic mild depressive disorder. AR 888 (citing on AR 718, 721).

ALJ Tompkin gave only partial weight to Dr. Vanderplate's opinion, unlike the prior ALJ who gave Vanderplate's opinions "great weight." *Compare* AR 888 *with* AR 18. ALJ Tompkin agreed with Vanderplate that Rivers was capable of performing complex tasks, but concluded that Vanderplate had not imposed "sufficient limitations related to social functioning" considering the

1    evidence that Rivers had homicidal ideation towards his cellmate in 2007 and that Rivers was
2    belligerent and threatening at a medical facility in 2013 (resulting in his brief detention). ALJ
3    Tompkin noted additional problems with Vanderplate's opinion, including a failure to identify
4    why Rivers's self-reported checklist tests (presumably ones administered by Catlin) resulted in an
5    exaggeration of his symptoms and Vanderplate's failure to recognize Rivers's episodes of
6    decompensation since 2008. *Id*. As a result, Tompkin rejected Vanderplate's "sweeping
7    conclusion." *Id*.

8    The ALJ gave significant weight to other opinions in the record including "great weight"
9    to state agency medical consultant's July 2013 opinion (Covey) that the claimant was capable of
10   performing complex work with no more than mild ongoing limitations in an environment with
11   limited public contact. AR 886-888. ALJ Tompkin gave "partial weight" to consultative
12   examiner Kollath's 2018 opinions that, consistent with her clinical findings and Rivers's own
13   reported activities, he was not or only mildly impaired in most areas, although ALJ Tompkin
14   concluded that Rivers's mental impairments caused moderate difficulties with social interactions.
15   AR 886- 888.

16   After the RFC analysis, the ALJ concluded that Rivers was unable to perform his past
17   relevant work as a System Analyst. AR 888-89. Considering the VE's testimony as well as
18   Rivers's age, education, work experience, and RFC, the ALJ determined that Rivers acquired
19   work skills from past relevant work that were transferable to other occupations such as data entry
20   jobs. AR 889-90. Alternatively, even if Rivers acquired no transferable work skills, significant
21   number of jobs existed in the national economy that Rivers can perform, including Hospital
22   Cleaner, Janitor, and Groundskeeper. AR 890. As a result, the ALJ found that Rivers was not
23   disabled as defined in the Social Security Act. AR 891.

24   The Appeals Council denied review on December 20, 2020. AR 870-75. Now before the
25   District Court again, Rivers appealed *pro se*.

## LEGAL STANDARD

### I. DISABILITY DETERMINATION

28   A claimant is "disabled" as defined by the Social Security Act if: (i) "he is unable to

8

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (ii) the impairment is "of such severity that he not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)–(B); *Hill v. Astrue,* 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R § 404.1520(a)(4)(i)–(v).

In the first two steps of the evaluation, the ALJ must determine whether (i) the claimant is not performing substantial gainful activity, and (ii) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)–(ii). An impairment must have lasted or be expected to last 12 months in order to be considered severe. *Id.* § 404.1509. In the third step, the ALJ must determine whether the impairment meets or medically equals a listed impairment described in the administrative regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ has to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five. *Id.* § 416.920(e). In step four, the ALJ must determine whether the claimant is capable of performing his or her previous job. *Id.* § 416.920(a)(4)(iv). The claimant bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)

Once the claimant has established a prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are significant number of jobs in the national economy that the claimant can do. *Parra, 481 F.3d at 746;* 20 C.F.R. §§ 416.920(a)(4)(v),(g); 416.960(c). There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (i) by the testimony of a vocational expert or (ii) by reference to the Medical–Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir. 1999). If the Commissioner

meets the burden at step five, the claimant is not disabled. *Tacket*, 180 F.3d at 1099; 20 C.F.R. § 404.1520(f).

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir.1996); *see also DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991) ("We review the ALJ's determination ... to determine whether it was supported by substantial evidence and whether it was based on the proper legal standard."). Substantial evidence means "'more than a mere scintilla,' but less than a preponderance." *See Saelee v. Chater,* 94 F.3d 520, 521–22 (9th Cir. 1996) (internal quotations and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389 (1971) (internal quotations and citation omitted). A court must review the record as a whole and consider adverse as well as supporting evidence. *See Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *See Morgan v. Comm'r of the Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *See Robbins,* 466 F.3d at 882 (internal quotations and citation omitted); *see also Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007). If the legal error is harmless, then a reversal is unwarranted. *See Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir. 2012) ("We may not reverse an ALJ's decision on account of an error that is harmless."). An error is harmless when it is "inconsequential to the ultimate nondisability determination." *Molina,* 674 F.3d at 1115 (internal quotations and citation omitted).

To properly reject the opinion of a treating or examining doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing reasons" for doing so. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). However, if the treating or examining physician's opinion is contradicted by another physician, an ALJ may reject the treating or examining physician's opinion if she states "specific and legitimate reasons" that are supported by substantial

evidence. *Id*. at 830–31.

## DISCUSSION

The only argument raised by Rivers on this second appeal is whether ALJ Tompkin gave too much weight to testifying expert Vanderplate and too little weight to the examining psychologist Catlin. While the prior ALJ improperly gave "great weight" to Vanderplate's opinions weight because Vanderplate ignored record evidence (regarding decompensation and symptoms), failed to provide sufficient reasons for discrediting Catlin's opinions based on Rivers's self-reported symptoms, and cherry-picked evidence from the record, 2017 Order at 15-18, ALJ Tompkin only provided partial weight to Vanderplate's opinions for those very reasons.

Instead of relying as heavily on Vanderplate's opinions, and after giving Catlin also partial weight, ALJ Tompkin looked to *other* opinion evidence in the record to support her conclusion that Rivers is not entitled to benefits. She relied on the consistent opinions from Covey (state medical examiner) and Kollath (examining clinical psychologist who examined Rivers in 2018), who both opined that Rivers had no or only mild limitations. AR 1144-1161. ALJ Tompkin accepted those conclusions, except that she imposed moderate limitations regarding social interactions based on Rivers's well-established and consistent history of anxiety. ALJ Tompkin also identified the substantial evidence demonstrating that Rivers functioned well in his daily life activities and his ability to interact appropriately with people at school, on public transportation, in the gym given his modifications (doing errands early in the morning, taking his anti-anxiety medications) and that his mental health conditions responded well to medications and improved with medication adjustments. AR 883-884, 887.

Reviewing the evidence as a whole, ALJ Tompkin had specific and legitimate reasons to give only partial weight to Catlin's 2013 opinions that were based on a one-time examination. ALJ Tomkin justifiably relied on the 2013 opinions of Covey that were consistent with the 2018 opinions of examining psychologist Kollath and the substantial evidence of the extensive activities Rivers was able to engage in on a daily basis, demonstrating that his subjective testimony about his limitations and inability to work were not consistent with the medical and other evidence in the record. AR 885.

Rivers does not point to any medical or opinion evidence that was ignored or misconstrued by ALJ Tompkin. Instead, as noted, he complains only of ALJ Tompkin's provision of partial weight to Catlin (the ALJ discounting Catlin's opinion as to his significant limitations) and partial weight to Vanderplate (agreeing that Rivers had no to mild limitations, but disagreeing and imposing moderate limitations on social interaction). Those determinations were based on "specific and legitimate" reasons supported by substantial evidence.

## CONCLUSION

ALJ Tompkin's decision is supported by substantial evidence and free from legal error. Defendant's motion for summary judgment is GRANTED and plaintiff's motion is DENIED.

**IT IS SO ORDERED.** Dated: December 15, 2021



William H. Orrick
United States District Judge